**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,                                             Crim. No. 11-10 (JNE/JJK)

         Plaintiff,

v.                                                     **REPORT AND RECOMMENDATION**

Terrell Randle,

         Defendant.

Jeffrey M. Bryan, Esq., Assistant United States Attorney, counsel for Plaintiff.

Terrence P. Duggins, Esq., Duggins Law Firm, counsel for Defendant Randle.

This matter is before the Court on Defendant Terrell Randle's First Motion to Suppress Evidence. (Doc. No. 38.) This Court held two evidentiary hearings on the motion on May 11 and 13, 2011, and received testimony from Trooper Isaac Vernon Monson from the Minnesota State Patrol in Martin County, Deputy Jacob Ruppert from the Martin County Sheriff's Office, and Deputy Clinton Cole, also from the Martin County's Sheriff's Office. This Court also received five exhibits from the Government: two video discs of the police encounter at issue, and three incident reports authored by Deputies Ruppert and Cole and Officer Chad Sanow. The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For

the reasons stated below, this Court recommends that Defendant Randle's motion be denied.

## BACKGROUND[1]

On January 11, 2011, Defendant was indicted for possession with intent to distribute cocaine base ("Crack") in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (Doc. No. 8.) The facts giving rise to Defendant's Indictment are as follows. On December 10, 2010, Trooper Isaac Vernon Monson was travelling on Interstate 90 in Martin County, which is one of the counties that he patrols. (Tr. 14.) He observed a vehicle travelling eastbound that appeared to be speeding. (Tr. 15.) Officer Monson followed that vehicle and determined that the vehicle's speed in fact exceeded the posted limit of seventy miles per hour. (Tr. 15, 16.) Trooper Monson testified that he observed the vehicle's speed to fluctuate between approximately 65 and 82 miles per hour. (*Id.*) The vehicle also drifted outside of the marked traffic lanes. (*Id.*) At that point, Trooper Monson activated his police lights and Defendant pulled the vehicle to the side of the road. (Tr. 17.)

The traffic stop began at approximately 12:15 a.m. (*Id.*) As Trooper Monson approached Defendant's vehicle on foot, he observed Defendant making sudden furtive movements; Trooper Monson approached the vehicle carefully,

---

[1] The following summary is based on the testimony of Trooper Monson, Deputy Cole, and Deputy Ruppert at the evidentiary hearings, and the hearing exhibits.

adjusted his line of sight, and slowed down his approach as he tried to see what Defendant was doing.  (Tr. 19, 20, 34.)  As Trooper Monson walked towards the car he also noticed that the registration on the vehicle was a temporary paper license plate, and he observed that there were two people in the vehicle: Defendant (the driver) and a female passenger.   (Tr. 19.)

After Trooper Monson reached the vehicle, he explained the reason for his traffic stop to the occupants and asked for identifying documents, such as a driver's license, insurance, or vehicle registration.  (Tr. 19, 20, 21.)  Defendant had an Illinois driver's license, which he provided to Trooper Monson. Defendant also acknowledged that he was driving 85 miles per hour.  (Tr. 21.) Trooper Monson then asked several routine questions as part of his investigation into possible traffic-related offenses, including questions regarding the name of the vehicle's registered owner and the travel plans of the occupants.  (Tr. 21–23.) In response to these questions, Defendant claimed that he was coming from South Dakota, where he had met his cousin, and that the car was owned by the passenger.  (Tr. 22, 38.)  As to the passenger, she claimed that she had no identifying documents with her.  (Tr. 21.)  Trooper Monson then asked if she had anything with her name on it—any "paperwork," or a "check stub"—and stated that he needed to obtain the information that would appear on the car's title.  (Tr. 23.)   Neither Defendant nor the passenger could provide insurance and registration documents relating to the car.  (Tr. 21.)  Defendant, who had earlier stated that the vehicle was the passenger's vehicle, at that point stated that he

3

and the passenger jointly own the car and their names were on the car title. (Tr. 24.) The passenger then provided what turned out to be a false name to Trooper Monson. (Tr. 22, 26, 32.) She told Trooper Monson that her name was Ashante F. Fitz. When he asked what her middle name was, the passenger said that she could not recall. (Tr. 22, 32.) It later turned out that her actual name was Shante Tianna Newsome. (*Id.*)

Trooper Monson testified that this initial exchange lasted three or four minutes. (Tr. 24.) When Trooper Monson returned to his squad car, he attempted to determine whether the vehicle had a valid temporary license plate and whether the vehicle's registration was current, a process complicated by the fact that he did not have a valid name for the passenger/owner. (Tr. 25.) He also requested the assistance of Martin County Sheriff's Deputies on duty at that time. (*Id.*) Sheriff Deputies Cole and Ruppert arrived approximately five minutes after Trooper Monson called them. (Tr. 35.)

Trooper Monson then returned to the stopped vehicle and asked the passenger to exit the vehicle. (Tr. 31.) At that time, Trooper Monson had not yet determined who the owner of the vehicle was, whether it had a valid license plate, whether its registration was current, or even the identity of the passenger. (Tr. 30–32.) After removing the passenger from the vehicle, Trooper Monson again asked for her name. (Tr. 31–32.) He also asked her other routine traffic-related questions, such as where they were coming from and the purpose of their trip. (Tr. 35, 36.) In response to these questions, the passenger claimed that

4

she and the driver had taken the driver's cousin to South Dakota and were returning to Chicago.  (*Id.*)

Trooper Monson then walked back to the stopped vehicle and, while looking into the vehicle through the passenger window, asked Defendant several routine traffic-related questions regarding the identity of the passenger and car owner, such as, "what's her name?" (Tr. 37, 38.)  He also asked about the trip to South Dakota.   Defendant's answers directly contradicted the statements that the passenger made regarding the purpose for the trip.   (Tr. 37, 38.)  For example, Defendant stated that he and the passenger alone went to South Dakota to visit a cousin, which conflicted with the passenger's explanation that she and Defendant drove the cousin, who was visiting Chicago, from Chicago to South Dakota.   (Tr. 38.)   Defendant was then asked to exit the vehicle and placed in one of the law-enforcement vehicles on scene at approximately 12:30 a.m.  (Tr. 39.)  He was not handcuffed at that point.  (*Id.*)

Trooper Monson testified that during these encounters with Defendant, he had noted several suspicious things:  (1) the conflicting statements by Defendant and the passenger regarding the nature of their trip; (2) the evidence of "hard driving"[2] in the middle of the night, such as the presence of food wrappers and bottles, and Defendant's statement that he had made a one-day round trip

---

[2]   "Hard driving" or "hard travel" is a term used to describe non-leisure long distance driving without stopping, "common to drug couriers."   *United States v. Mayo*,  627 F.3d 709, 711 (8th Cir. 2010)

between Chicago and South Dakota; (3) a perceived substantial age difference between Defendant and the passenger, which, when coupled with the fact that her identity was unknown, raised the possibility of criminal activity, including, prostitution, sex trafficking, or kidnaping; (4) the temporary license plate and unknown registration validity, which was consistent with possible criminal activity, including drug trafficking and auto theft; (5) multiple cell phones; (6) furtive movements; (7) a heavy masking odor; and (8) Defendant's extreme nervousness, well beyond the average level of nervousness that Trooper Monson has observed in the thousands of traffic stops that he estimated he has conducted, including lack of eye contact and Defendant's shaking hands.  (Tr. 27, 29, 30, 31, 53.)  Based on these observations, Trooper Monson decided to request a canine unit, and at approximately 12:31 a.m., Trooper Monson asked Deputy Cole to contact his dispatcher and request a drug dog.  (Tr. 39–40.)

Trooper Monson also testified that the local police department canine unit was off-duty at that time, and was about five miles away from the location of the traffic stop.  (Tr. 40–41.)  Trooper Monson stated that he typically has to wait about ten or fifteen minutes for this canine officer when he is on-duty, and can wait for as long as "an hour or more" when this officer is off-duty.  (Tr. 41–42.) Importantly, Trooper Monson stated that when he requested the canine unit, he still had not determined whether the temporary license plate was valid, whether the vehicle's registration was current, and the true identity of the passenger.  (Tr. 42.)

Trooper Monson testified that he finally received confirmation of the registration and the license plate's validity at approximately 12:45 a.m., thirty minutes after the initiation of the stop.  (Tr. 43.)  The vehicle was registered in the name of the passenger, Shante Newsome.  (Tr. 60.)  Trooper Monson testified that at this point, the traffic investigation concluded.  (*Id.*)  Specifically, Trooper Monson stated that had he not observed other suspicious conduct, he would have released Defendant at that point, but decided to wait until the canine unit concluded its check of the vehicle.  (Tr. 44.)  Officer Chad Sanow and his canine arrived approximately six minutes after he finally received proof of valid license plates and registration, and thus, the total amount of time that lapsed from the conclusion of the traffic investigation, at about 12:45 a.m. and the arrival of the canine was between six and nine minutes.  (Tr. 44–45.)

After Officer Sanow arrived at the scene, he passed around the vehicle with his canine. (Tr. 45.)  The canine alerted to the exterior of the vehicle, including the seam between the passenger side doors, the rear seam on the trunk, and the driver side of the vehicle.  (*Id.*)  After the canine alerted positive for drugs, the police searched the interior of the vehicle.  The Officers testified that they found bags of white powder substances and white rock substances bagged in a manner consistent with narcotics in the pockets of male and female clothing found inside the vehicle.  (Tr. 46.)  The police also recovered a digital scale with white powdery residue.  (Gov't Ex. 3.)  The bagged substances were later field tested and identified as crack cocaine.  (*Id.*)

7

**ANALYSIS**

Defendant argues that the police encounter and the subsequent warrantless search of his vehicle violated his constitutional rights. Specifically, he argues that although the initial traffic stop was lawful, the police unlawfully exceeded the scope of the initial encounter by continuing the detention pending the arrival of the canine unit, and searching the vehicle without a warrant. The Government disagrees. This Court concludes that Defendant's motions to suppress evidence should be denied. The police encounter with Defendant—- including the initial stop, the questioning, the detention pending the arrival of the canine unit, and the search of his vehicle—were proper, and no evidence should be suppressed.

**A.    The Traffic Stop**

Any traffic violation, however minor, provides probable cause for a traffic stop. *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990). At the hearing, Defendant's counsel conceded that Trooper Monson had the requisite probable cause to initiate the traffic stop. (Tr. 6.) Thus, Defendant does not dispute the probable cause basis underlying the stop. Regardless, this Court finds that there was probable cause for Trooper Monson to conduct a traffic stop of the vehicle.

Further, once Trooper Monson stopped the vehicle, he was entitled to conduct an investigation "reasonably related in scope to the circumstances that justified the interference in the first place." *Cummins*, 920 F.2d at 502. This

reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose.  *See United States v. Richards*, 967 F.2d 1189, 1193 (8th Cir. 1992) (concluding that asking driver stopped for "swerving" lane change to sit in patrol car was within the scope of the stop); *Cummins*, 920 F.2d at 502 (concluding that officer's asking as to why driver committed a traffic violation is reasonably related to the purpose of the stop).   Here, Trooper Monson asked several routine questions as part of his investigation into possible traffic-related offenses, including questions regarding the name of the vehicle's registered owner and the travel plans of the vehicle occupants, and he received a series of contradictory answers to his inquiries.   He received confirmation of the validity of the license plate and registration for the vehicle at approximately 12:45 a.m., thirty minutes after the initiation of the stop.

**B.     Reasonable Suspicion to Extend the Traffic Stop**

Defendant argues that Trooper Monson extended the traffic stop beyond the period reasonably necessary to complete it when he waited for the canine unit to check out the vehicle, and that this was done without any reasonable suspicion that Defendant was engaged in illegal activity.    This Court disagrees.

"If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has 'justification for a greater intrusion unrelated to the traffic offense.'"  *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir.1994) (en banc) (quoting *Cummins,* 920 F.2d at 502).  While

9

"reasonable suspicion" must be more than an inchoate "hunch," the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).   In determining whether Trooper Monson had a reasonable suspicion, this Court must consider the totality of the circumstances in light of Trooper Monson's experience.  *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (internal quotations and citations omitted); *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (same).  Notably, "[a]lthough each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, 'a combination of factors may warrant further investigation when viewed together.'" *Fuse*, 391 F.3d at 929 (quoting *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002)).

This Court concludes that by the time Trooper Monson finally verified the vehicle's license and registration information and the passenger's identity, he had developed reasonable suspicion of illegal activity sufficient to detain Defendant for further investigation and wait for the arrival of the canine unit.   The totality of the following circumstances provided reasonable suspicion that criminal activity was present, justifying the continued detention and expanded the scope of the stop:  (1) false and evasive statements by Defendant and the passenger regarding the passenger's identity and the car's ownership; (2) the inability to

determine whether the vehicle's registration was current; (3) Defendant's unusual itinerary--a day round trip from Chicago to South Dakota; (4) inconsistent explanations by Defendant and the passenger regarding the purpose of their trip; (5) a heavy masking odor in the car; (6) Defendant's nervousness, lack of eye contact, and shaking hands, which Trooper Monson stated went beyond what he sees in routine traffic stops; (7) the passenger's attempt to hide her true identity by giving a false name to the officer at the initial encounter, coupled with Trooper Monson's difficulty in determining her age[3]—because she looked like she could be less than 18-years old—raised the possibility of criminal activity such as prostitution, sex trafficking, or kidnapping; (8) the vehicle's temporary license plate; and (9) evidence of "hard driving" in the middle of the night, such as bottles and food wrappers.  From these facts, Officer Monson inferred that Defendant might have contraband in the car—possibly drug related—based on all the suspicious activity he observed, including the heavy masking odor in the car. This reasonable suspicion of criminal activity permitted Officer Monson to extend the initial traffic stop to request the canine unit.

Defendant nonetheless argues that Trooper Monson unreasonably delayed the traffic stop to wait for the canine unit.  But there is no evidence in the record to indicate that Trooper Monson deliberately delayed the traffic so that a canine unit could arrive and inspect the car.  Officer Monson's testimony

---

[3]   This Court notes that Trooper Monson determined that the passenger was twenty-one years old only at approximately 12:45 a.m., after he made a request for the canine unit.  (Tr. 53.)

makes clear that when he requested the canine unit, he still had not determined whether the vehicle's temporary license plate was valid, whether the vehicle's registration was current, and the true identity of the passenger.  And only approximately fifteen minutes had passed from the time Trooper Monson initially stopped the car until the canine officer was alerted.

To be sure, a dog sniff may be the product of an unconstitutional seizure if the traffic stop is unreasonably prolonged before the dog is employed.  *Illinois v. Caballes*, 543 U.S. 405, 408 (2005).  But "[w]hen police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one . . . the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times."  *Bloomfield,* 40 F.3d at 917.  Here, Trooper Monson decided to request a canine unit about fifteen minutes into the stop.  He  asked Deputy Cole to call for the nearest available drug dog after he developed a reasonable suspicion of narcotics possession, which Deputy Cole did.   The nearest dog was assigned to Officer Sanow, who was off-duty at that time, and was approximately five miles away from the location of the traffic stop.

Officer Sanow arrived with his dog only six to nine minutes after Trooper Monson finally received proof the vehicle's valid license and registration, and about twenty minutes after Trooper Monson and Deputy Cole requested his presence.   And the total amount of time from when the traffic stop commenced until the arrival of the canine was between thirty-six and thirty-nine minutes.

Here, there is no evidence that Trooper Monson, Deputy Cole or Officer Sanow were dilatory in their investigation or that there was any unnecessary delay. The six-to-nine-minute wait from when the traffic stop completed until the canine's arrival, or the thirty-six to thirty-nine-minute duration of the entire police encounter was not excessive under the circumstances. *See United States v. Shafer*, 608 F.3d 21 1056, 1062–63 (8th Cir. 2010) (finding that a 31-minute wait for canine sniff not unreasonable after traffic stop for speeding); *United States v. Lyons*, 486 F.3d 367, 373-74 (8th Cir. 2007) (concluding that after a speeding violation, the trooper was justified in waiting 31 minutes for dog sniff); *United States v. Donnelly*, 475 F.3d 946, 951, 954 (8th Cir. 2007) (holding that a 59-minute detention to wait for a drug dog was reasonable where the officer requested the dog immediately after developing reasonable suspicion); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (finding that a detention of 45 minutes was not unreasonable, even when the canine arrived 2-3 minutes after the initial traffic stop, but canine sniff did not commence until 45 minutes after initial stop); *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) (determining that it was reasonable for an officer to detain a truck for 80 minutes while awaiting the arrival of a drug dog where the officer "acted diligently to obtain the dog, and the delay was caused only by the remote location of the closest available dog"). In sum, the officers here acted diligently in pursuit of their investigation, Trooper Monson's reasonable suspicion supported the

continued detention, and the wait for the arrival of the canine unit was not excessive under the circumstances.

**C.     Probable Cause to Search the Vehicle**

Defendant also argues that the warrantless search of Defendant's vehicle was unconstitutional.  This Court disagrees.  The automobile exception allows officers to conduct a warrantless search of a vehicle when they have probable cause to believe it contains contraband or evidence of criminal activity.  *See California v. Carney*, 471 U.S. 386, 390 (1985) (discussing the automobile exception).  Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Determining whether probable cause exists at the time of the search is a "common sense, practical question" to be determined from the "totality-of-the-circumstances." *Id.* at 230.

Here, the canine's alert to the exterior of the vehicle, including the seam between the passenger-side doors, the rear seam on the trunk, and the driver side of the vehicle, provided probable cause to conduct a search of Defendant's vehicle for controlled substances.[4]  *See United States v. Olivera-Mendez*, 484 F.2d 505, 512 (8th Cir. 2007) (stating that the dog's "alert established probable cause to believe the vehicle contained hidden contraband" and such probable

---

4       This Court notes that a dog sniff of the exterior of a vehicle does not constitute a search, and thus does not implicate Defendant's Fourth Amendment rights. *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005) (citing *Caballes*, 543 U.S. at 407–08).  Thus, a dog sniff of the exterior of a vehicle requires neither probable cause nor reasonable suspicion. *Id.* at 772.

cause "justifies the search of every part of the vehicle and its contents that may conceal the object of the search"); *see also United States v. Jauregui*, No. 10-272(4), 2011 WL 753120, *4 (D. Minn. Feb. 9, 2011) ("The dog then alerted to the trunk of the vehicle, which created independent probable cause to conduct a search of the trunk for controlled substances."); *United States v. $186,907.00 in U.S. Currency*, No. 07-3229, 2008 WL 2985703, *5 (D. Minn. July 31, 2008) (stating that "once the canine alerted on the exterior of [the] trailer, the officer had probable cause to search the trailer's interior without a warrant.") (internal quotations and citations omitted).   Accordingly, this Court recommends that Defendant's motion to suppress be denied.

## RECOMMENDATION

Based on the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant's First Motion to Suppress Evidence (Doc. No. 38), be **DENIED**.

Date: June 22, 2011

*s/Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 6, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply

with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.